UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BRIAN SCACCIA,

                        Plaintiff,

            vs.                                                          98-CV-1663
                                                                         (NAM/DEP)

DR. NANCY STAMP, DR. ROBERT VAN
BUSKIRK, DR. DAVID E. MURRISH, DR. SUSAN
STREHLE, DR. MARY ANN SWAIN, DR. STEPHEN
J. GILJE, DR. SANDRA MICHAEL, DR. J.
STANLEY WHITTINGHAM, DR. MATTHEW
DILLON, DR. R. STIMSON WILCOX, AND LAURA
WEISER,
                        Defendants.
_____

APPEARANCES:

BRIAN SCACCIA
Plaintiff, *Pro Se*

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
Andrew M. Cuomo                                    Douglas J. Goglia, Esq
The Capitol                                        Asst. Attorney General
Albany, New York 12224

Norman A. Mordue, Chief U.S. District Judge

MEMORANDUM DECISION and ORDER

I.      INTRODUCTION

        Plaintiff commenced the present action pursuant to 42 U.S.C. § 1983 in 1998.  Defendants

were or are professors, students or administrators of the Department of Biology at the State

University of New York at Binghamton where plaintiff was enrolled as a graduate student during

the relevant period of this litigation.  Due to protracted discovery disputes between he and

defense counsel, the entry and exit of several lawyers on both sides and plaintiff's pursuit of a

number of appeals of minor procedural matters, this case has endured untenable delays.  In 2001, Judge McAvoy dismissed all but two of the claims in plaintiff's complaint.  There are only two claims remaining for this Court to review.  Presently pending is defendants' motion for summary judgment dismissing the remainder of plaintiff's claims pursuant to Fed. R. Civ. P. 56.  Plaintiff opposes defendants' motion.

II.     RELEVANT FACTS

The facts that the parties agree on are as follows:  In 1993, plaintiff was admitted as a student to the Graduate School of SUNY Binghamton to study for the Master of Arts ("M.A.") degree in the Biology.  Plaintiff had been admitted to SUNY Binghamton with a Bachelor of Science ("B.S.") degree.  Plaintiff was offered a Graduate Teaching Assistantship, which carried a stipend of $9,100, and a tuition scholarship for the Fall 1993 and Spring 1994 semesters.  Plaintiff disputes virtually everything else in defendants' 7.1 Statement of Material Facts, so the Court will begin with defendants' version of the facts.

When initially accepted to SUNY Binghamton, plaintiff was provided with a copy of the University Assistantship, Fellowship and Tuition Scholarship Terms and Conditions Statement for 1993-1994 (the "Terms and Conditions Statement").  Among other things, the 1993-94 Terms and Condition Statement provided that "Graduate students with Tuition Scholarship support are required to maintain the appropriate level of registration as defined for their level.  Registrations and fee payments must be completed before the first day of classes." The 1993-94 Terms and Condition Statement further provided that:

> [a]ll assistantship and fellowships are renewed on a competitive basis
> and are granted for a maximum of two semesters at a time.  Eligibility
> for University funding is limited as follows:
> A. Master's candidates may be supported by University funds for a

2

maximum of four semesters.
B. Ph.D. candidates who enter our program with a Master's Degree are
eligible for 6 semesters of University Support.
C. Other Ph.D. candidates may be supported by University funds for a
maximum of ten semesters.

Plaintiff also was provided with a copy of the SUNY Binghamton Biology Department's

Graduate Student Handbook (the "Department Handbook").   The Department Handbook made

clear that "[b]ecause the ability of the Department to provide support for graduate students is

limited, there are limits on both the number of semesters a student is eligible for support and also

on the number of credit hours a student may take with a tuition waiver."   Much like the Terms

and Conditions Statement, the Department Handbook also stated that "[a] Masters of Arts student

is normally eligible for 4 semesters of support, and "graduate students in the Ph. D. Program are

initially eligible for 6 semesters of support."   The Department Handbook also set forth the

Biology Department's expectations with respect to students seeking the Doctor of Philosophy

("Ph.D."): "[t]he Ph.D. is a research degree.   Entering graduate students are expected to affiliate

with a Supervising Professor and establish a research program in the first year.   The student's

progress is monitored by a Supervising Committee."   The formal steps leading to the degree were

listed as follows:

1. Affiliate with a Supervising Professor by the fourth week of the
second semester after entry into the program.
2. Establish a Supervising Committee in the second semester.
3. Take a Qualifying Examination by the end of the second semester.
4. Have at least one formal meeting with Supervising Committee each
year to discuss research.
5. Take the Comprehensive Examinations. Students entering the
program with a BA or BS must complete all exams by the end of the
sixth semester.  Students entering with a M.A. Degree have until the
end of the fifth semester to complete exams.
6. Submit a Dissertation Prospectus within three months after
completion of the Comprehensive Exams.

3

7. During the last semester in residence students must:

a. Declare candidacy for the degree.
b. Request an outside thesis examiner.
c. Submit the thesis.
d. Give a departmental seminar.
e. Take the final oral thesis defense.

The Department Handbook expressly cautioned that "[i]t is the responsibility of the student and supervising professor to know the rules and procedures leading to completion of the requirements for the degree."

The Biology Department's expectations with respect to students seeking the Ph.D. were consistent with those set forth in SUNY Binghamton's general Graduate School Student Handbook (the "Graduate School Handbook").  Among other things, the Graduate School Handbook stated in unequivocal and unambiguous terms that a student seeking a Ph.D. must: (a) "demonstrat[e] to an examination committee, by means of a comprehensive examination (written and/or oral) of familiarity with basic hypotheses and techniques of the discipline and competence of applying them;" (b) fulfill "any research skills requirements;" and (c) successfully "defend a doctoral dissertation at a final oral examination."   The Graduate Handbook also made clear that: [g]raduate students may be dropped from the Graduate School by action of the vice provost, on recommendation of the departmental or school graduate committee, if it appears that they are not making satisfactory progress toward the degree and it is unlikely that they will satisfactorily complete the requirements for a degree.

All students admitted into the Biology Department's graduate program with a B.A. or B.S. are admitted as M.A. students.  While a graduate student may be on a "Ph.D. track" during his first years of enrollment in the graduate school, the student remains a M.A. student until formally

4

admitted to candidacy for the Ph.D. by the student's Supervising Committee.  A M.A. student can be admitted to candidacy for the Ph.D. only after (a) successfully completing comprehensive examinations, (b) submitting a proper Dissertation Prospectus to the student's Supervising Committee, and (c) gaining the Supervising Committee's approval of the Dissertation Prospectus.  A "declaration of candidacy" for the award of the degree is made for the purpose of notifying the Graduate School that the student intends to defend the dissertation.  A "declaration of candidacy" for the award of the Ph.D. must be made by the student during his final term in residency at the University.  After a graduate student who officially is a Ph.D. candidate declares him or herself ready to defend the dissertation, the student must request and obtain an outside thesis examiner (if not already done), submit a doctoral dissertation, give a departmental seminar, and orally defend his or her dissertation – all before being awarded the doctoral degree.

A graduate student need not always be advanced to Ph.D. candidacy by the Supervising Committee.  A student may elect not to proceed with the steps required for admission to Ph.D. candidacy by the Biology Department.  Even if admitted to Ph.D. candidacy, a student may elect not to proceed with dissertation completion and instead graduate from SUNY Binghamton with a M.A. (assuming that the student has fulfilled the M.A. requirements).  Graduate students who initially consider themselves on the "Ph.D. track" frequently elect not to pursue a doctoral degree at some point during the process for any number of reasons.  All graduate students entering with a B.A. or B.S. into the graduate program of SUNY Binghamton's Biology Department are admitted as M.A. students and become Ph.D. candidates only after completing comprehensive examinations, submitting and gaining approval of a dissertation prospectus, and then being formally admitted to candidacy for the Ph.D.  To become a Ph.D.

candidate, a graduate student must make substantial progress towards the degree and complete specified tasks as outlined in the Department and Graduate School Handbooks.

According to defendants' Statement of Material Facts Not in Dispute, plaintiff was admitted to SUNY Binghamton's Graduate School "to study for the Master of Arts degree." Plaintiff enrolled for classes at SUNY Binghamton during the Fall 1993 and Spring 1994 semesters. Plaintiff was provided with financial support for the Fall 1993 and Spring 1994 semesters. Plaintiff was awarded a teaching assistant position through the 1994-95 and 1995-96 academic years. Plaintiff resigned from this teaching position for the Spring 1995 semester. During the ensuing three years (or six academic semesters), while plaintiff was on the so-called "Ph.D. track," he did not make significant progress toward his degree. For instance, by the end of the second semester, plaintiff failed to finalize a preliminary research proposal, schedule a meeting with his proposed supervising committee, or take his qualifying examination as required by the Biology Department Handbook. Finally, on June 10, 1994, several weeks after the end of his second semester, plaintiff belatedly requested that a supervising committee be formed. He then completed his qualifying examination on June 14, 1994, weeks after the semester had come to a close. During plaintiff's qualifying examination, his supervising committee determined that he would take two comprehensive examinations sequentially, in approximately March and December 1995. Thus, the supervising committee anticipated that plaintiff would complete his comprehensive examination requirement by the end of his fifth semester at SUNY Binghamton.

By the beginning of his fourth semester at SUNY Binghamton, defendants assert that plaintiff still had not begun his comprehensive examinations. On February 3, 1995, the Biology Department's Graduate Committee sent plaintiff a memorandum which cautioned him that

"[Ph.D.] students entering the program with a [B.A. or B.S.] must complete all exams by the end of the Fifth Semester."   The memorandum also reminded plaintiff that he already had received three semesters of support and tuition assistance, and M.A. students are eligible for only four semesters of support.  On March 21, 1995, halfway into his fourth semester at SUNY Binghamton, plaintiff was warned by defendant Stamp, his supervising professor, that she soon would be asked to evaluate his progress towards the degree, and was in the "awkward position of not being able to give a positive report" because (a) she had not received any written report from plaintiff since his last committee meeting in June 1994; (b) he had neither planned nor participated a committee meeting that was required to take place by March 31, 1995, and (c) he had neither begun nor planned to begin his comprehensive examinations.  Despite defendant Stamp's explicit warning, two more weeks passed and plaintiff neither planned for nor began his comprehensive examinations.

In an evaluation prepared on April 6, 1995, defendant Stamp wrote that plaintiff "[d]oesn't plan well – which makes it difficult to conduct research well."  Regarding his performance, she wrote in her April 6, 1995 evaluation: "High intellectual ability, high motivation, writes well.  Have not seen a written report of last summer & fall's research – verbal report was vague and inadequate."  As to areas of needed improvement, defendant Stamp concluded that plaintiff needed to "[t]ry harder to anticipate research needs and to avoid conflicts with others in the lab and department."  She further concluded that plaintiff needed to "[s]ee responsibilities through to completion (e.g., supervising undergraduate researchers)."  On May 8, 1995, defendant Stamp sent plaintiff a letter regarding the scheduling of a meeting to discuss his lack of progress toward the Ph.D.  In that letter, defendant Stamp wrote:

7

> [a] meeting tomorrow at 11 AM is okay, but only if you are much
> more prepared for a meeting than you were last week. Too often you
> come to our meetings unprepared (e.g., about two of every three
> meetings last fall) and it becomes a waste of time for both of us.

As for his options at that time, she continued that:

> [i]t is extremely unlikely that you could finish a Ph.D. here in less than
> 4 years.  You will need at least two and more likely three summers to
> complete the research, and given that you haven't made plans for this
> summer yet, it seems unlikely to me that much will come of this
> summer.

She then suggested:

> [y]ou could possibly use your work from last summer as the basis of
> a Master's Thesis, and fill in the "holes" this summer. I cannot assess
> the possibility of that without seeing a written report of what you
> accomplished last summer, complete with summary tables and figures.
> I asked you repeatedly for such a report last fall, and it is also
> necessary so that your graduate research committee can evaluate your
> progress in the program. Neither the committee nor I would be able to
> recommend a fifth semester of support (TA line) without such a report
> and reasonable progress this summer.

She continued:

> I asked you last fall to talk with me by mid-February about your
> research plans for this summer. You have not yet discussed your plans
> with me. I want to see a written proposal of your research plans for
> this summer.  You really need to make up your mind about what you
> want and commit to it fully. It is not clear to me that what you want is
> a degree from [SUNY Binghamton] working with me on
> plant-herbivore-enemy interactions. I need to see a clearer
> commitment from you.

Despite defendant Stamp's efforts, defendants allege plaintiff made little, if any, progress
toward his degree over the Summer of 1995.  On October 3, 1995, well into his fifth semester at
SUNY Binghamton, defendant Stamp wrote the other members of plaintiff's supervising
committee to request their help in "reinforcing some messages" to plaintiff.   The messages that

she sought to convey to plaintiff were: (a) he was not making adequate progress toward the degree, and (b) if he did not make substantial progress during the upcoming year, he would lose his financial support. On October 4, 1995, plaintiff had a "formal research meeting" with his supervising committee. At that meeting, the committee expressed its concern that plaintiff had failed to develop and execute a research plan. The committee explicitly directed him to submit a research proposal sufficient to indicate "exactly what research" he would complete before the end of the 1996 Spring semester. The committee then emphasized "[a]s to next May, we will expect that you will have completed the research that you propose to us." Finally, plaintiff was explicitly admonished by the supervising committee as to the ramifications of a failure on his part:

> [w]e hope that you will have completed a solid piece of research, which will demonstrate to us that you are in the right program (training for a career as an experimentalist). However, we may recommend that you switch to the Master's track. If this happens it will most likely be because we see some potential for research but feel that either you need more time to develop research skills and to demonstrate to us that the Ph.D. track is appropriate for you, or experimental research seems not to be your forte.

By the end of October 1995, it had become clear to defendant Stamp that plaintiff no longer wished to work with her. Defendant Stamp therefore resigned as his supervising professor. In her letter of resignation to plaintiff, defendant Stamp stated:

> [o]ur relationship has deteriorated over the last year to the point that you no longer are willing to take my advice or even discuss your research with me and the lab . . . . and aren't coming to lab meetings or keeping regular [appointments] with me. Over the last 2 years, six people have told me about your complaining about me as an advisor and I know that you have been trying to transfer to Cornell. Obviously, you don't want to work with me. So I am resigning as your advisor. If you plan on staying here, you need to affiliate yourself with someone else as soon as possible.

9

Defendant Stamp elaborated in a memorandum she subsequently sent to plaintiff's supervising committee that:

> [s]ince the last committee meeting [on October 4, 1995, Plaintiff] and I met twice but on each occasion he resisted discussing his research. . . . . Since the two meetings this month, Brian has not shown up for lab meetings or his regular appointment with me.  In other words, he no longer is willing to take my advice or even discuss research with me or others in the lab.

She further explained:

> I have given Brian many second chances. He created so many problems in my lab in the summer and fall of 1994, to the point that no one wanted to work with him, that I almost threw him out of the lab.  And he always had an excuse for why he has never shown me any data.  We came to an agreement that he would complete some clearly specified tasks no later than the end of March, '95 (e.g., provide me with his summer research schedule, have a committee meeting to discuss this new direction, finish overseeing a Howard Hughes scholar's project).  By May he had
> done nothing.  At that point I told him to find a new advisor.  He came back and promised to complete certain experiments and a proposal by the end of August.  But he did not do any of that . . . .

In her letter of resignation to plaintiff, defendant Stamp also suggested that he consider a M.A. or M.A.T., rather than a Ph.D..  She made this suggestion after concluding that plaintiff lacked the temperament for academic science, e.g., for completing research in a timely fashion, obtaining necessary funding, publishing, and balancing the demands of research and teaching.

On November 9, 1995, plaintiff met with defendant Murrish, the Director of Graduate Studies for the Department of Biology, and informed him that defendant Stamp had resigned as his supervising professor and that he was unable to obtain a new supervising professor.  Plaintiff also informed defendant Murrish that he wanted to work toward a M.A. degree, rather than a Ph.D..  Defendant Murrish told plaintiff that there would be an issue as to continuing his financial

10

support because M.A. students are entitled to only four semesters of support, and plaintiff would already have received four semesters of support by the spring of 1996.  When defendant Murrish asked plaintiff on November 9, 1995, about his research progress, plaintiff stated that he had a new research problem in mind, but was unable to provide details.

On November 14, 1995, defendants allege that plaintiff, without authorization, removed a collection of laboratory specimens – a colony of stinkbugs – from defendant Stamp's laboratory. They allege that plaintiff demanded that in exchange for the return of the stink bugs he be given his own research space. Plaintiff also insisted that defendant Stamp not be permitted to issue a grade for his fall 1995 Biology 696 requirement in exchange for return of the stinkbugs. Defendant Stamp believed that plaintiff had improperly interfered with research being conducted by a former graduate student, defendant Laura Weiser.  Defendant Stamp filed a grievance against plaintiff with the Biology Department's Grievance Committee on November 22, 1995.

By January 4, 1996, the beginning of plaintiff's sixth semester with SUNY Binghamton, plaintiff had neither affiliated with a supervising professor, begun comprehensive examinations, nor submitted a dissertation prospectus.  Plaintiff was sent a memorandum by the Graduate Committee pointing out his deficiencies. The Graduate Committee reminded plaintiff that M.A. students normally are eligible for only four semesters of financial support, and by that date, plaintiff had received four semesters of support.  On January 29, 1996 defendant Van Buskirk, then Chair of the Biology Department, recommended to the Graduate School that plaintiff be terminated as a graduate student.  However, by February 2, 1996, defendant Susan Strehle, Vice Provost of Graduate Studies and Research determined not to comply with Dr. Van Buskirk's request.  On February 9, 1996, Dr. Van Buskirk renewed his request that plaintiff be terminated.

11

On February 20, 1996, Vice Provost Strehle again declined.

Thereafter, plaintiff filed a grievance against defendants Stamp and Van Buskirk, and on April 17, 1996, the Biology Department's Grievance Committee issued its conclusions and recommendations.  Specifically, the Biology Department's Grievance Committee recommended that plaintiff's grievances against defendants Stamp and Van Buskirk be denied.  However, the Biology Department's Grievance Committee also recommended that requests made by defendants Stamp and Van Buskirk that plaintiff be "severed" from SUNY Binghamton be withdrawn. Finally, the Biology Department's Grievance Committee recommended that the Graduate Committee review plaintiff's academic performance, and discuss with him constructive options for his future.

On April 29, 1996, the Recommendation of the Biology Department's Grievance Committee was adopted in whole by Dr. Karl A. Wilson, who was the Acting Chair of the Biology Department.  On May 3, 1996, plaintiff indicated that he wanted to meet with the Graduate Committee "at the earliest possible time."  The Graduate Committee met with plaintiff on May 17, 1996.  On that same date, plaintiff submitted an appeal from the denial of his grievance against defendants Stamp and Van Buskirk.  Earlier during the Spring of 1996, plaintiff applied for a sixth semester of financial support, for the Fall of 1996.  By letter dated April 6, 1996, defendant Murrish, the Biology Department's Director of Graduate Studies, denied plaintiff's request, and responded:

> [i]t is my unenviable duty to inform you that the Graduate Committee of the Department of Biological Sciences cannot support your request for a graduate assistantship for the fall 1996 Semester.  You started out in the Fall Semester, 1993 on the Ph.D. track. However, on November 9, 1995, you indicted (sic) to me that you wished to be in the Masters Program. The Binghamton University Bulletin and

12

> departmental Graduate Student Handbook both state that a Master of
> Arts student is eligible for 4 semesters of support. Since your arrival
> in the department, you have received 5 semesters of support. Thus,
> you have exceeded the expectation of support for a M.A. student and
> are no longer eligible for an assistantship.

In correspondence dated May 5, 1996, plaintiff insisted that defendant Murrish misinterpreted his comments made during their November 9, 1995 meeting.

Apart from appealing from the denial of his grievance against defendants Stamp and Van Buskirk on May 17, 1996, plaintiff submitted an appeal from defendant Murrish's April 6, 1996, determination to discontinue his financial support for the Fall 1996 Semester.  By letter dated June 3, 1996, defendant Strehle informed plaintiff that both appeals would be heard together so that a single Graduate School Grievance Committee could "hear the entire story once."  On that same date, defendant Murrish informed plaintiff by letter that the Biology Department had acceded to one of his demands – he would not be graded by defendant Stamp for Biology 696 in the Fall 1995 Semester, and would receive a grade of "S" (Satisfactory) for Biology 696 in the Spring Semester 1996.  In that letter, plaintiff also was informed that if he could not affiliate with a supervising professor during the Summer of 1996, he would have to enroll in Biology 700 so he could remain continuously enrolled at SUNY Binghamton, and thus maintain his matriculated status in SUNY Binghamton's graduate program.

Notwithstanding defendant Murrish's warning, plaintiff had failed to register for the Fall 1996 term by October 1, 1996.  On October 2, 1996, plaintiff was allowed to belatedly register. On that same date, plaintiff also requested that SUNY Binghamton waive his tuition and fees for the Fall 1996 Semester.  Also on October 2, 1996, defendant Strehle sent plaintiff a letter in which she reminded him of her previous offer to, among other things, provide plaintiff with a

financial fellowship for the Fall 1996 semester, "with a backup, should [he] need it, for the spring

semester."

On November 26, 1996, after a two-day hearing, a Grievance Committee of the SUNY

Binghamton Graduate School rejected plaintiff's appeals, and unanimously determined there to be

no merit in the charges he leveled against defendants Murrish, Van Buskirk and Stamp.  On

December 13, 1996, SUNY Binghamton Provost Mary Ann Swain adopted the recommendation

of the Graduate School Grievance Committee in full and wrote:

> I have reviewed the information surrounding the grievance you filed
> against Professors David Murrish, Nancy Stamp, and Robert Van
> Buskirk. I have read the minutes and listened to the tapes from the
> hearing held by the Grievance Committee on November 25 and 26,
> 1996.  I have read the documents presented as part of the hearing.
> Finally, I have considered the recommendation of the Grievance
> Committee forwarded to me. I concur with the recommendation of the
> Grievance Committee.  In my opinion, the grievance you filed has not
> been substantiated.

Plaintiff did not register for the Spring 1997 semester, and thereby allowed his

enrollment at SUNY Binghamton's graduate school to lapse.

According to plaintiff's Statement filed in opposition to defendants' Local Rule 7.1

Statement of Material Facts Not in Dispute, the Department of Biology at SUNY Binghamton

"enticed" him to attend the graduate school by informing him "orally and in writing" that

"doctoral students were continuously funded with educationally valued teaching or research

apprenticeships."  Defendants Murrish, Stamp and others enticed plaintiff to attend the school by

claiming SUNY had quality supervision of research and a "flexible" approach for graduate

students.  Plaintiff believed that with faculty sponsorship and assistance, additional years of

non-SUNY funding was available, from sources such as the National Science Foundation

14

("NSF").

Prior to enrolling, plaintiff  acknowledges he received a copy of the Graduate School
Handbook for the 1993-4 academic year.  According to plaintiff, the Graduate School Handbook
stated that "rules are flexible and limitations may be waived in favor of the student upon request."
According to plaintiff, the Graduate School Handbook also stated that "offers of continuous
funding to entice students must be honored by departments with students getting up to six years of
assistance," "educational assistantships were to advance a student's professional development and
not conflict with other work;" "just-cause removal was limited to unsatisfactory academic or
apprenticeship performance, or time limits" and in plaintiff's estimation, "even these
circumstances did not mandate loss of student funding."  Plaintiff avers that the Graduate School
Handbook stated responsibility for appointing faculty advisors for graduate students rested with
the dean, chair and departmental graduate advisor.  It was the duty of appointed members of the
supervising committee to serve as advisors for students in the doctoral program until they finished
administering a student's comprehensive exams.  After, students could obtain advisors from other
universities to serve on their committee.  The Graduate School Handbook stated that the average
time to complete a Ph.D. degree for students entering the Department with a Bachelor's Degree
was 6.34 years.

According to plaintiff, the Department administered comprehensive exams that could be
retaken at least once, with up to five more years allowed to complete the degree.  The Graduate
School Handbook stated satisfactory progress was a B average.  Students were placed on
probation when their cumulative grade-point average ("GPA") fell below 3.0 and could remain on
probation up to four semesters.  Students "were not making satisfactory progress toward their

15

degree" when their cumulative GPA placed them "on a fourth semester of probation, or a second semester in academic jeopardy" when the cumulative GPA fell below 2.6.  Plaintiff asserts that the Graduate School Handbook stated advisors were required to give special counseling when concerned about a student's progress.  Students who were not progressing with research or who needed to raise performance to satisfactory levels were are given special research skills courses. The Director of Graduate Studies was required to meet at least once each semester with students on probation to review academic performance and progress towards returning to good standing.

Plaintiff alleges that students could enroll in "continuous registration both to ensure a leave of absence from campus was not held against them without having to reapply."  Plaintiff also avers that the Graduate School Handbook "encouraged students to register before the start of the semester, but students commonly did not do so without detriment."  Plaintiff also refers to portions of the Department Handbook attached to the affidavit of defendant Murrish which clearly states  "M.A. students are only Ph.D. track until they pass their qualifying exams after which they 'formally enter the Ph.D. program' and are thereafter referred to and classified as 'Ph.D.' students.'" Plaintiff asserts that the Department treated M.A. and Ph.D. students differently:  a) M.A. students, even within the Ph.D. track, got three advisors, whereas Ph.D. students got four; and b) M.A. and Ph.D. students were also identified and differentiated on student identification cards and a course numbering system in which M.A. students enroll in "Biol 597" for research credit, whereas Ph.D. students enroll in "Biol 696."

Plaintiff notes that the Department Handbook also stressed "maximum flexibility for the program" which was "in concordance with the Graduate School Handbook."  The Department Handbook's flexible guidelines suggested plaintiff had six semesters for completion of the

16

comprehensive exams.  According to plaintiff, Professor David Wilson testified in November 1996, that professors and students "commonly ignored guidelines in the Department Handbook." Plaintiff claims that after "completing the requirements for formal entry into the Ph.D. Program, he was officially entered into the Ph.D. program, became a Ph.D. Student, was identified as a Ph.D. student in documents; and his student identification card changed from 'Graduate Student' to 'Ph.D. Student'; and his Ph.D. research progress was graded in Biol. 696 unlike MA students."

Plaintiff asserts that his research and academic grades while at SUNY were always satisfactory.  According to plaintiff, the Department never placed him on probation or academic jeopardy.  He was never offered or given special counseling or special research skills courses, as plaintiff asserts he was never failing.  Plaintiff asserts defendant Stamp never worked with or assisted him in the lab to observe or instruct him on techniques or methods to prepare or conduct his research.  Plaintiff alleges that he advanced his writing and research skills despite a lack of oversight or assistance.   According to plaintiff, all department students received yearly "Satisfactory Progress Toward the Degree" ("Satisfactory Progress memo") reminders of what they must accomplish before graduation so students "d[id]n't forget" they needed to "maintain momentum" to finish their degrees," or they could otherwise "lose support or be dismissed for unsatisfactory progress."  Plaintiff found the Satisfactory Progress memos "ambiguous, unclear, false and misleading" because: (a) "they falsely claimed the Department Handbook contained a four to five semester deadline for comprehensive exams when the Department Handbook had a suggested six semesters;" (b) "parts applied to M.A. students and other parts stated they applied to Ph.D. students;" (c) "they falsely claimed Ph.D. students received four years of funding, in contrast to what is stated in both the [Graduate School] and Department Handbooks, what

plaintiff was told and what was custom and practice."  Plaintiff believes "defendants sought to defame him through his file by placing their Satisfactory Progress memos in it."

The gravest tension between plaintiff and defendant Stamp arose in the context of his alleged criticism of her research.  Plaintiff asserts that Stamp made false and misleading claims that: a) the Manduca caterpillars were not omnivorous; b) the bugs could selectively avoid the more toxic parts of their prey; and c) the caterpillars she studied were native to Binghamton.  Plaintiff believes that after he discussed the alleged "flaws" in defendant Stamp's research with his committee and others, he was punished by defendant Stamp who took retaliatory action against him.

On or about October 13, 1995, plaintiff alleges that defendant Stamp's employee, Todd Osier, presented some of their research on Manduca caterpillars.  Plaintiff asserts he asked "rhetorical" questions, but defendant Stamp "attempted to deflect" them.  Plaintiff also asserts:

> Another question I had concerned extra-oral digestion of prey and Osier admitted that the entire caterpillar was digested except for exoskeleton in contrast to Stamp's claims.  After, members of Stamp's lab felt I was a traitor for asking difficult questions about research supervised by Stamp.  My discussions with Stamp about our differences concerning bugs and during Osier's seminar were polite and not disruptive.  Had defendants produced documents I sought in discovery, I would likely be able to produce additional witnesses supporting my right to speech claims at SUNY.

On 10/18/95, defendant Stamp informed plaintiff she was planning on terminating their student-advisor relationship.  Plaintiff made it clear that he planned to stay at SUNY in meetings with Professors Wilson, Titus, Shepherd, Parker, Murrish, Michael, and again in 1996 with Van Buskirk, and Strehle.  Plaintiff alleges defendant Stamp made informal and formal, oral and written complaints against those who met with plaintiff or she believed sympathetic to plaintiff.  Plaintiff "believes this, alone and in combination with other actions taken by her and others,

18

interfered with [his] ability to freely associate with faculty and students, prevented [him] from obtaining advisors, and resulted in a permanent suspension of [his] progress."  Professor David Wilson informed him that the "department was poisoned against [him,] that plaintiff had to leave SUNY, and that [his] isolation must be painful."

Lacking a supervisory role, plaintiff alleges that defendant Stamp "then acted improperly to investigate his teaching and eliminate his funded apprenticeship."  Plaintiff believes that defendants Murrish and Michael assisted defendant Stamp in her efforts by helping her with a grievance against him by knowingly violating department rules in order to produce "a prejudged outcome, a covert suspension and his constructive termination."  According to plaintiff, he attempted to become the student of Professors Parker, Wilson, Clark and Wilcox.  Plaintiff believes the "evidence shows [defendants] Michael, Stamp, Murrish, and Van Buskirk actively prevented me from obtaining advisors."  Plaintiff asserts that more than a month after he openly contested the merits of defendant Stamp's research, defendants first began, without his knowledge, referring to him as a "failing" student in documents.  It is his belief that defendants Stamp, Murrish, Van Buskirk, Michael, Wilcox, K. Wilson, Dillon and Swain all contributed to falsely portray his academic and research progress at SUNY as being unsatisfactory, in contrast to rules and guidelines, in order to keep him permanently "suspended, demoted, and constructively terminated."  Despite Swain's earlier contention that plaintiff was "owed a fellowship and an advisor," on January 8,1997, Swain, Michael, Murrish, Strehle, and Night met and decided to "bar [him] from registering before the semester began, without notice."  Plaintiff alleges that defendants' justification was to "'put the ball in [his] court' on belief that [he] did not have the money to sue."  Plaintiff also asserts that defendants "reported him to SUNY security."

One month after his "speech at the seminar," plaintiff believes defendant Stamp "staged an event" to sever him on disciplinary grounds by either giving the appearance that he "sabotaged" the bug colony as revenge or stole them after falsely claiming ownership of plaintiff's research bugs.  Plaintiff asserts that defendants Stamp and Weiser took actions "that gave an appearance that he killed and stole bugs, and harmed an alleged planned experiment."  On November 11, 1995, plaintiff discovered that someone sabotaged his bug colony by placing large numbers of the smaller stinkbugs and eggs in Vaseline lined petri dishes, which caused them to get stuck and die.  Plaintiff took the colony home before returning them to SUNY, allegedly without condition, at the request of Professor David Wilson.  Plaintiff denies making any demands in exchange for return of the bugs or that he needed to make demands.  Plaintiff finds defendant Stamp's claims in this regard are baseless and unsupported by facts and cites the testimony of Professor David Wilson in his defense.

Plaintiff believes the evidence shows defendants Murrish, Wilcox, Michael, Van Buskirk, K. Wilson, Dillon, Swain, Gilje and Whittingham all took actions that were "unprofessional, retaliatory, malicious, and arbitrary, with deliberate indifference or in total disregard to the facts in order to assist defendant Stamp with her disciplinary and professional claims against him" over the next 14 months.  Plaintiff believes a "Misconduct Doctrine" was "invented just for him that was 'not based on any existing rules, expanding federal regulations for vertebrates to cover insects, stripping subordinates and visitors of property rights, eliminating witnesses, and otherwise fixing the outcome of all future action against [him].'"

Plaintiff believes the evidence shows that defendants Van Buskirk, Murrish, Wilcox, Stamp and Strehle "all took actions before and during the 'Informal Invitational Inquiry' to

terminate him in a prejudged procedure not based on any SUNY rules or regulations for procedures, which required him to wave (sic) [his] two (sic) process rights, and was designed to harm [his] record at SUNY and prevent the advancement of [his] career elsewhere."  According to plaintiff, Strehle informed him that he was "essentially suspended" and due to the "defamation and departmental politics" it would be unlikely that anyone was "brave enough" to become his advisor.

In February 1996, the department announced that it was under review for possible elimination which plaintiff believes reinforced defendants' belief that he needed to be "silenced." Days later, he filed a grievance against defendants Van Buskirk and Stamp to obtain advisors, end his suspension, stop the retaliation against him, and have SUNY evaluate defendant Stamp's research.  A Departmental grievance hearing was held in early spring 1996 to hear his claims. Plaintiff believes the evidence shows that the hearing was transformed from his grievance into a "Misconduct Doctrine hearing against him.  He alleges he was denied the right to present evidence and question witnesses.  He also alleges that defendant Stamp gave written testimony that was "false and misleading."  At the hearing, Mr. Osier testified that defendant Stamp's lab considered plaintiff a "traitor" amongst other things.  Thereafter, plaintiff alleges defendants issued "a series of verdicts" that left plaintiff "constructively terminated."

Plaintiff asserts that Murrish's claim that plaintiff visited him November 1995, and orally requested placement in the M.A. program is false and violates SUNY rules requiring official requests for changes in status to be in writing.  In September 1996, plaintiff asserts that he was informed that if he "waived [his] rights to sue, accepted a demotion to a substandard M.A. program and worked off-campus, defendants would appoint [him] advisors but not a supervising

professor to review research."  According to plaintiff, a grievance appeal hearing concerning his grievance against defendants Stamp and Van Buskirk was held on November 25-26, 1996, in which he believes his rights to due process were violated.

At trial, plaintiff states he also plans to "submit evidence of graduating Ph.D. students who did not begin one of their comprehensive exams until after receiving six semesters of support."  In 1996, plaintiff asserts that he "learned from [defendant] Stamp's most recent graduate student that she was not returning to SUNY due to what she termed was a 'horrible experience'"  with defendant Stamp, and "before summer, [defendant] Stamp's only other Ph.D. student left SUNY with a M.A.."  According to plaintiff, SUNY admits M.A. students into the doctoral program only when "near the completion of [their] master's work."  Plaintiff asserts that he "cannot identify a single Ph.D. student who became a candidate, and who did not finish with a Ph.D. or M.A. absent a death or other major tragedy."

III.    DISCUSSION

A.    Standard of Review

1.    Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986).  Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute.  *See id.*  A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party

believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant is able to establish a *prima*

*facie* basis for summary judgment, the burden of production shifts to the party opposing summary

judgment who must produce evidence establishing the existence of a factual dispute that a

reasonable jury could resolve in her favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment

may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc.*

*v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated

speculation.  *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

      In *pro se* cases, "special solicitude should be afforded *pro se* litigants generally, when

confronted with motions for summary judgment."  *Graham v. Lewinski*, 848 F.2d 342, 344 (2d

Cir. 1988); *see also*, *Ruotolo v. Internal Revenue Serv.*, 28 F.3d 6, 8 (2d Cir. 1994).  In this case,

plaintiff's knowledge of the requirements of Rule 56(e) is conclusively established by defendants'

notice of motion which contained the detailed notice suggested in *Graham*, and the numerous

extensions the Court afforded plaintiff to file his response to defendants' summary judgment

motion.  Given plaintiff's lengthy declaration and Local Rule 7.1 Statement filed in response to

defendants' Statement of Material Facts Not in Dispute, the Court finds he was fully aware of his

obligations under Rule 56 of the Fed. R. Civ. P..

      It is with these considerations in mind that the Court addresses defendants' motion for

summary judgment.

2.    <u>Preliminary Procedural Matters</u>

      The Court will address briefly the parties' arguments concerning dismissal based on

procedural grounds.  Defendants unfortunately devoted most of their allotted memorandum of law to recounting plaintiff's various discovery failures, which frankly, is not newsworthy to the Court. Given plaintiff's *pro se* status and defense counsel's failure to have made a record before the Magistrate Judges of plaintiff's alleged bad faith or dilatory motive in allegedly failing to comply with discovery, the relevance of plaintiff's alleged discovery failures is negligible.  Equally irrelevant are plaintiff's vague arguments that he has somehow been prevented in unidentified ways from fully opposing defendants' motion because of defendants' failure to oblige his discovery demands.  Further, the Court will ignore plaintiff's objections throughout his papers to defendants' use of "plural instead of singular nouns."

3.      Plaintiffs' Claims Under 42 U.S.C. § 1983

        Both of plaintiffs' remaining causes of action are premised on violations of federal and constitutional rights actionable under 42 U.S.C. § 1983 which provides a federal cause of action for "deprivations of any rights, privileges or immunities" secured by the Constitution and federal laws.  To state a claim upon which relief may be granted under § 1983, a plaintiff must allege: 1) that the challenged conduct was attributable to a person acting under color of state law; and 2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or the laws of the United States.  *Eagleston v. Guido*, 41 F.3d 865, 876 (2d Cir. 1994).

        Plaintiff's third cause of action alleges violation of his substantive due process rights secured by the Fourteenth Amendment to the Constitution.  Substantive due process protects individuals against government action that is arbitrary, conscience shocking, or oppressive in a constitutional sense, but not against government action that is "incorrect or ill-advised."  *Bishop*

24

*v. Wood*, 426 U.S. 341, 350 (1976).  Review of the various paragraphs comprising plaintiff's third cause of action reveals allegations that defendants denied plaintiff substantive due process by: 1) demoting him from the Ph.D program to the Masters Degree program; 2) denying him funding for his doctoral program and/or terminating him from the doctoral program; 3) preventing him from completing the doctoral program; and 4) preventing him from entering a similar doctoral program at a comparable University in the United States.

To establish that defendants violated plaintiff's substantive due process rights, the Court must first inquire "whether a constitutionally cognizable property interest is at stake." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995).  The Second Circuit uses a strict "entitlement" test to determine whether a party's interest is protectible under the Fourteenth Amendment. *Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir. 1995) (citing *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 192 (2d Cir. 1994); *RRI Realty Corp. v. Inc. Vill. of Southamptom*, 870 F.2d 911, 918 (2d Cir.), *cert. denied*, 493 U.S. 893 (1989); *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 58-59 (2d Cir. 1985).  "This inquiry stems from the view that a property interest can sometimes exist in what is **sought** - in addition to the property interest that exists in what is **owned -** provided there is a 'legitimate claim of entitlement' to the benefit in question." *Id*. (emphasis in original) (citing *RRI Realty*, 870 F.2d at 915; *Yale Auto Parts*, 758 F.2d at 58.) "The analysis focuses on the extent to which the deciding authority may exercise discretion in arriving at a decision, rather than on an estimate of the probability that the authority will make a specific decision." *Id*. (citing, e.g., *Walz v. Town of Smithtown*, 46 F.3d 162, 168 (2d Cir. 1995) (homeowner had property interest in an excavation permit because superintendent of highways had no discretion to decline to issue it if the application stated the nature, location, extent and

purpose of the proposed excavations); *Gagliardi*, 18 F.3d at 192-93 (landowners had no property interest in enforcement of zoning laws for adjacent property, since municipal officials had broad discretion in determining whether to grant or deny building permit, site plan and variances); *RRI Realty*, 870 F.2d at 918-19 (no property interest existed in building permit because town officials had discretion to either grant or deny the permit).

In the present case, there are two related potential property interests - plaintiff's continued enrollment in the alleged Ph.D. program he claims to have been engaged in at SUNY Binghamton or the graduate program defendants claim he was enrolled in and his continued financial support from the University insofar as his receipt of graduate assistantship. The Court notes with respect to both interests, however, plaintiff has presented no evidence that he was actually deprived of either interest by defendants. Rather, it seems clear that after wrangling unsuccessfully over administrative grievances, plaintiff simply failed to register for classes at SUNY Binghamton for the Spring semester in 1997, thus allowing his registration to lapse and the promised "backup" financial fellowship defendant Strehle offered to lapse as well. Nevertheless, it seems clear that insofar as the latter property interest is concerned, in spite of usual and customary procedures, there is indisputably discretion on the part of University and/or departmental officials in awarding financial assistance to graduate students. Thus, plaintiff surely had no constitutionally cognizable property interest under the Fourteenth Amendment in a continued graduate assistantship or fellowship, even assuming he could demonstrate it was ever terminated by defendants.

With respect to plaintiff's continued enrollment in the Ph.D. or graduate education program, the Court notes the Second Circuit's recognition of "an 'implied contract' between [a college or university] and its students," requiring the "academic institution [to] act in good faith

26

in its dealing with its students." *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991) (citing *Olsson v. Bd. of Higher Ed.*, 49 N.Y.2d 408, 414 (1980). "Such an implied contract, recognized under state law, provides the basis for a property interest that would be entitled to constitutional protection." *Id.* (citing *Perry v. Sindermann*, 408 U.S. 593, 601-03, (1972)).   Though ordinarily the courts may not second-guess an educational institution's academic judgments, *see Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225-28 (1985), a Rule 12(b)(6) dismissal of a student's claim is improper where the contention is that the institution's action was "motivated by bad faith or ill will unrelated to academic performance," *see Clements v. County of Nassau*, 835 F.2d 1000, 1004 (2d Cir. 1987).

However, at least one Circuit has declined to find that a student's right to continued enrollment in a graduate program rises to the level of a constitutionally protected property interest on the ground that such an interest bears "'little resemblance to the fundamental interests that previously have been viewed as implicitly protected by the Constitution.'" *Mauriello v. Univ. of Med. & Dentistry of N.J.*, 781 F.2d 46, 50 (3d Cir.1986) (quoting *Regents of Univ. of Michigan*, 474 U.S. at 229-30 (Powell, J., concurring)).  Indeed, after *Board of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 91-92 (1978), in which the United States Supreme Court assumed federal courts could review academic decisions of a public educational institution under a substantive due process standard, most courts faced with such issues simply assume, without deciding, the existence of a constitutionally protected property interest.  *See* e.g., *Martin v. Helstad*, 699 F.2d 387, 390 (7th Cir.1983) (assuming arguendo a property interest in law school admission); *Amelunxen v. Univ. of Puerto Rico*, 637 F.Supp. 426, 431 n. 3 (D.P.R. 1986) (assuming arguendo that a student has a property or a liberty interest in continuing education).  In fact, these decisions

27

note that concerns of federalism, judicial capacity, and academic freedom counsel **against** the recognition of such an interest. *See Ewing*, 474 U.S. at 226 (expressing "a reluctance to trench on the prerogatives of state and local educational institutions and our responsibility to safeguard their academic freedom"); *Horowitz*, 435 U.S. at 92 (noting that courts "are particularly ill-equipped to evaluate academic performance").

This Court will do likewise and assume, without deciding, that plaintiff's right to continued enrollment at SUNY Binghamton is a constitutionally protected property interest under the Fourteenth Amendment since his claim for substantive due process may ultimately be dismissed on it merits. Indeed, a plaintiff cannot prevail on such a claim unless he shows that the defendants infringed his property interest in an arbitrary or irrational manner. *See Harlen Assoc. v. Inc. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001). Further, the defendants must also have acted in such a way as to "shock the conscience." *Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002). One's conduct will only be found to meet this definition where it is "egregious conduct which goes beyond merely offending some fastidious squeamishness or private sentimentalism and can fairly be viewed as so brutal and offensive to human dignity as to shock the conscience." *Id. Cf. Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 249-54 (2d Cir. 2001) (denying teacher qualified immunity from eighth grade student's due process claim where teacher grabbed the student by the throat, lifted him off the ground by his neck, dragged him across the floor, choked him, slammed his head into the bleachers four times, rammed his head into a metal fuse box and punched him in the face).

The Court finds that plaintiff has utterly failed to persuade that defendants' alleged conduct in this case rose to that level of offensiveness or brutality. It is clear that plaintiff found

much of his graduate school experience at SUNY Binghamton frustrating.  He obviously believed that some of the academic feedback he received from defendants was unwarranted and/or ambiguous and in some cases even "defamatory" although he does not elaborate on the nature of the alleged defamatory statements.  Plaintiff alleges that defendant Stamp made "informal, and formal, oral and written complaints" against those who met with him or who she believed were sympathetic to him which interfered with plaintiff's ability to "freely associate with faculty and students, prevented [plaintiff] from obtaining advisors and resulted in a permanent suspension of [plaintiff's] progress."  Plaintiff believes that defendants "actively prevented him from obtaining advisors."  Plaintiff, however, offers nothing but his own beliefs and conjecture in support of these allegations notwithstanding his obligation to come forward with actual evidence.   Plaintiff asserts that a number of the defendants met one night in early January 1997 and decided to "bar [him] from registering" but he offers no details on how they allegedly accomplished this.  Further, plaintiff avers that defendants "reported [him] to SUNY security" though the relevance of this allegation is unknown.

Plaintiff asserts that "someone" sabotaged his bug colony by placing large numbers of the smaller stinkbugs and eggs in Vaseline-lined petri dishes which caused them to get stuck and die.  Plaintiff claims that another professor told him to take the stinkbugs home which he did only to be accused later of stealing them.  Plaintiff claims this incident was then used by Stamp to accuse him of stealing and mishandling research specimens of another student and "holding them hostage" in exchange for various demands of his own including new research space.  In support of his claims he cites the testimony of Professor D. Wilson who apparently testified at the grievance committee hearing concerning the alleged stinkbug hostage affair.  After reading

Professor Wilson's testimony it appears that although he may not have started it, he may done

more than anyone to perpetuate that unfortunate crisis.  Defendant Stamp asserts that after the

stinkbugs disappeared from the lab, she was informed that plaintiff would not return them until

two demands were met: 1) she could not grade his work; and 2) he be given new research space.

For his part, plaintiff insists that he never made any such demands of Stamp or defendants and

never would have since he was not in need of any additional research space.  Plaintiff has

interpreted these allegations as additional evidence of defendants' attempts to slander him.  The

transcript of Professor Wilson's testimony reveals however that in fact, these demands may have

been his idea:

> [Addressing plaintiff:] Now things rose to crisis proportions when you
> took the colony and at that point I came in as a moderator role.  At that
> time I thought it was extremely important to separate you and Nancy
> in every way possible.  And so this meant, of course returning the
> colony, getting you out of Nancy's area, ah research area entirely, ah
> and . . . making it so that you had basically had nothing . . . nothing to
> do with each other.  That would include Nancy not having ah . . . ah
> not grading you with respect to your performance.  So it would also
> include ah finding space for your things that was not in Nancy's area.
>
> . . .
>
> Well I can't tell you who initiated demands, but what I can tell you is
> what my own efforts were and what I thought was a reasonable
> solution.  You take something like space.  It might seem very
> unreasonable to say that a graduate student without a major professor
> is entitled to have some space somewhere.  Okay that seems like an
> unreasonable demand especially an unreasonable demand for a
> graduate student to make.  It is not an unreasonable thin[k](sic) for a
> conflict resolution person to try to accomplish, especially when it's a
> short term solution.  And so what I can say is that ah ah although I'm
> vague about how this idea originated, it became my goal to do these
> things in order to separate the parties, to get the colonies back, to get
> the keys returned, to do well by Nancy, by completely removing Brian
> from her lab, and do well by Brian by giving him a place to put his
> stuff et cetera, et cetera.  This became my goal.

There is simply no evidence that defendant Stamp or any other defendant: a) stole or killed any of

plaintiff's stinkbugs; b) placed Vaseline in plaintiff's stinkbug petri dishes; or c) was involved in making false accusations against plaintiff over the missing stinkbugs, particularly since plaintiff admits that he took the stinkbug colony and Professor Wilson admitted he told defendant Stamp plaintiff was making demands in exchange for return of the colony.

Plaintiff alleges in only the vaguest of terms that defendants acted in total disregard of the facts to assist Stamp" with her disciplinary and professional claims against him.  Plaintiff asserts claims in vague conspiratorial language: he believes that a "Misconduct Doctrine" was invented "just for [him] that was not based on any existing rules, expanding federal regulations for vertebrates to cover insects, stripping subordinates and visitors of property rights, eliminating witnesses, and otherwise fixing the outcome of all future action against [him]."  Plaintiff asserts other claims in dramatic and formalistic language: he believes the evidence shows that the "Informal Invitational Inquiry" undertaken by the Department allowed defendants to terminate him in a "prejudged procedure not based on any SUNY rules or regulations for (sic) procedures" which required him to "wave (sic) [his] two (sic) process rights, and was designed to harm [his] record at SUNY and prevent the advancement of [his] career elsewhere."  Plaintiff asserts that he was denied the opportunity to present evidence and question witnesses at the hearing but he does not state what evidence and which witnesses he was not allowed to present.  Plaintiff avers that Stamp gave false and misleading testimony at the hearing, but he does not state what portion(s) of her testimony were so.

Although plaintiff claims that defendant Strehle informed him he was "essentially suspended," it is apparent from the evidence in the record as well as her deposition testimony that defendant Strehle did **not** terminate or suspend plaintiff - notably against the loud opposition of

31

several of the other defendants - prior to the grievance committee hearing for the very reason that she wanted to give him a full and fair opportunity to tell "his side of the story" as a still fully matriculated student.  Moreover, plaintiff claims he was "constructively terminated," but it is clear that he was never actually terminated as a student, nor was his funding terminated, despite the wishes of a number of faculty members and administrators.  Indeed, even after he was notified in the Fall of 1996 that his funding was terminated, defendant Strehle confirmed to plaintiff in writing that her offer of a fellowship for the Fall 1996 semester still stood along with a "backup" if needed for the Spring 1997.

Was plaintiff a Ph.D. student as he insists or simply a M.A. student who had not completed the required exams and research to be on a Ph.D. track as asserted by defendants? Plaintiff has provided no evidence that he took any of the examinations or conducted any of the preliminary research work necessary to prove he was moving along the Ph.D. track, much less was well on his way to a doctoral degree.  Plaintiff asserts that "at trial" he will present "evidence of Ph.D. students who did not begin one of their comprehensive exams until after receiving sixth (sic) semesters of support."  This is summary judgment, however, and the time to present evidence is now.  In the end, whether plaintiff was "defunded" or "demoted" matters not because the dispute is not material.  Indeed, the irony of this case is that the **flexibility** that plaintiff insists is at the heart of the SUNY Binghamton graduate program is the one thing he indisputably got in this case.  In spite of his alleged academic and/or research and/or disciplinary failures, he was offered nothing, if not flexibility by SUNY Binghamton as evidenced by defendant Strehle's refusal to dismiss him from the program despite the insistence of defendant Van Buskirk.  As referenced above, defendant Strehle made a written offer of a fellowship for 1996/97 school year

- which would have been plaintiff's seventh and eighth semesters of financial support.  Plaintiff simply failed to register for classes and take advantage of this offer.  Defendants cannot be faulted for this failure.  Plaintiff claims in vague terms that students were allowed to engage in something called "continuous registration" and/or "late registration," but there is no evidence demonstrating plaintiff was "continuously registered" at the university or that defendants were responsible for his lapse in registration.

While it is undisputed that plaintiff was admitted to SUNY Binghamton as a M.A. student and completed coursework with the hope that he would obtain a Ph.D. in the future, there is no evidence that he was actually "demoted" or "defunded" from a Ph.D. program or for that matter that he ever made meaningful progress toward a Ph.D. at SUNY Binghamton.  While it certainly may have been all the parties' **intention** that plaintiff proceed along SUNY Binghamton's Ph.D. track in Biological Sciences, plaintiff has simply failed to present evidence that he took the requisite exams and conducted the required research work to actually be considered part of the doctoral program.  For instance, though he makes the conclusory claims that he "complet[ed] the requirements for formal entry into the Ph.D. program" and he was "officially entered into the program," he does not provide the date(s) that any of these events allegedly occurred, the time or place that he met with his supervising committee which would have had to authorize his entry into the Ph.D. program, the names of any of the members of his supervising committee, or the title or subject matter of his Dissertation Prospectus.  Moreover, though plaintiff asserts that defendants actively prevented him from gaining entry into another graduate program at comparable universities, nowhere does he present evidence that he either applied to or was denied entry into any other graduate school or that any defendant interfered with his attempt to gain entry

into any graduate school.

Even if there was evidence that plaintiff was dismissed or demoted in some way from the Ph.D. program, however, the Court finds that defendants provided plaintiff with adequate procedural process.  Indeed, his procedural due process claims were dismissed by Judge McAvoy.  Thus, plaintiff's alleged elimination from the program - if indeed it occurred - was not arbitrary and capricious.  *See Regents of Univ. of Michigan*, 474 U.S. at 225 ("When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment." )  Courts may not "override" the decisions of university faculties concerning the promotion or graduation of students "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."  *Id.* n. 11 (citing *Cf. Youngberg v. Romeo*, 457 U.S. 307, 323 (1982)).

The record before this Court demonstrates that defendants had legitimate academic concerns regarding plaintiff's ability to obtain the Ph.D. degree he professed to be interested in pursuing when he entered SUNY Binghamton as a M.A. student.  The record also demonstrates that plaintiff was afforded numerous opportunities to demonstrate his ability to improve and that even when he did not improve and the Department recommended that he be terminated and/or defunded, he was neither terminated nor defunded at the insistence of defendant Strehle.  Nothing in the record demonstrates defendants' conduct herein "shocked the conscience" or permits "an inference of some nonacademic motivation."  *Branum*, 927 F.2d at 705.  While plaintiff's opposition papers are replete with accusations that defendants, particularly that defendant Stamp "hated" him and tried to "silence" him, he presents nothing short of his own vague and

conclusory insinuations of defendants' personal animus.  In summary, assuming plaintiff had a property interest in his continued enrollment at SUNY Binghamton, he has not demonstrated that defendants deprived him of any substantive due process rights guaranteed by the Fourteenth Amendment.

4.    Retaliation Based on Violation of First Amendment Rights

Plaintiff alleges his First Amendment rights were violated when defendants retaliated him by demoting and/or defunding him from the Ph.D. program as a result of his public criticism of defendant Stamp's research including her methods.  To establish a First Amendment retaliation claim, a plaintiff must show: (1) his speech addressed a matter of public concern; (2) he suffered an adverse employment action; and (3) a causal connection between the speech and the adverse employment action. *Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008) (citing *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006).  As referenced above, plaintiff has not demonstrated that he was demoted or defunded from SUNY Binghamton's Ph.D. program.  But even if he had, he would have a number of other problems in establishing a First Amendment retaliation claim on the part of defendants.  In the first instance, in spite of the vast record and plaintiff's one hundred and twenty-eight paragraph declaration, he does not at any point state the exact nature of the public statements he allegedly made that are at the heart of his protected speech claim.  True, plaintiff asserts that he criticized the nature, subject matter, and even some of the scientific conclusions of defendant Stamp's research on stinkbugs.  But even at this late stage of litigation, plaintiff is unable to state the words he spoke, to whom he spoke them or submit an affidavit from anyone who heard the words at the time they were spoken.

As a further matter, even if plaintiff were able to produce such evidence, it would not change the outcome.  Plaintiff's criticism of defendant Stamp's research - assuming it occurred as alleged by plaintiff - seems an insular matter of interest only in certain academic circles or among certain subsets of insect researchers.  It is well settled that employee expression is not a matter of public concern when it "cannot be fairly considered as relating to any matter of political, social, or other concern to the community."  *Singh* (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)).  Thus, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision."  *Id.* (quoting *Connick* at 147).  "Whether speech is a matter of public concern is question of law that is determined by the 'content, form and context of a given statement, as revealed by the whole record.'"  *Id.* (quoting *Connick* at 147-48 & n. 7).  In *Singh*, the Second Circuit found that the appellant's speech was not a matter of public concern, relating only to internal employment policies of the City and was made only in his capacity as an employee and not as a citizen.  *See id.* at 372.  As a result, the appellant could not establish the first element of his First Amendment retaliation claim.  *See id.*  Since plaintiff in this case cannot show that his alleged criticism of defendant Stamp's research rose to the level of a "matter of public concern," he has likewise not established the first element of his First Amendment retaliation claim.

Moreover, even if plaintiff had established this element of the retaliation claim, he has not set forth any evidence in support of the third element - a causal connection between the alleged criticism of defendant's Stamp's research and the alleged adverse employment or educational action which later befell him.  As referenced above, the record is replete with plaintiff's self-

36

serving conclusory accusations concerning defendant Stamp's alleged animus toward him and the alleged conspiracy she launched amongst defendants to eliminate him from the Biology Department at SUNY Binghamton.  Based thereupon, the Court finds an absence of evidence in the record upon which a fact finder could conclude a causal connection exists between the alleged protected speech and the alleged retaliation, even if either occurred.

IV.     CONCLUSION

Based on the foregoing, it hereby

ORDERED that the defendants motion for summary judgment pursuant to Rule 56 of the Fed. R. Civ. P. (Dkt. No. 218) is GRANTED; and it is further

ORDERED that the remaining third and fourth causes of action in plaintiff's complaint are hereby dismissed with prejudice and the complaint is hereby dismissed in its entirety.

IT IS SO ORDERED.

Date:   March 31, 2010
        Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge